IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
                                        )
XP VEHICLES, *et al.*,                   )
                                        )
                    Plaintiffs,          )          No. 12-774C (Judge Sweeney)
                                        )
          v.                            )
                                        )
UNITED STATES,                          )
                                        )
                    Defendant.          )   Dated: February 18, 2014
_____)


**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**


DANIEL Z. EPSTEIN
CAUSE OF ACTION
1919 Pennsylvania Ave, N.W., Suite 650
Washington, D.C. 20006
Telephone: (202) 499-4232
Facsimile: (202) 330-5842
daniel.epstein@causeofaction.org

REED D. RUBINSTEIN
KAREN M. GROEN

# TABLE OF CONTENTS

QUESTIONS PRESENTED .................................................................................................... 1

STATEMENT OF THE CASE ............................................................................................... 2

   I.     THE STATUTORY AND REGULATORY FRAMEWORK ...................................... 3

   II.    DOE IMPROPERLY POLITICIZED THE PROGRAMS ............................................ 5

   III.   XPV'S AND LIMNIA'S ODYSSEY ...................................................................... 7

STANDARD OF REVIEW ................................................................................................... 12

ARGUMENT ........................................................................................................................ 13

   I.     THE GOVERNMENT HAD A DUTY TO FAIRLY CONSIDER PLAINTIFFS'
        ATVM LOAN PROGRAM APPLICATIONS AND SO THE THIRD AND FOURTH
        CLAIMS FOR RELIEF STAND ................................................................................ 15

      A.  *Heyer* Controls. ................................................................................................ 17

      B.  DOE Breached an Implied-in-Fact Contract to Fairly Consider Plaintiffs' ATVM
         Loan Applications. ............................................................................................ 25

      C.  DOE Owed and Breached a Duty of Good Faith and Fair Dealing. ........................ 29

   II.    THE GOVERNMENT IS EQUITABLY ESTOPPED AND SO THE FIRST CLAIM
        FOR RELIEF STANDS ............................................................................................. 30

      A.  There Was a Contract, Implied-in-Fact, to Lend. .................................................... 30

      B.  The Government Should Be Estopped From Denying This Contract. .................... 31

   III.   THE GOVERNMENT IS ESTOPPED FROM REFUSING TO ACCEPT LIMNIA'S
        LG APPLICATION AND SO THE SECOND CLAIM FOR RELIEF STANDS. ..... 34

CONCLUSION ..................................................................................................................... 40

<u>**TABLE OF AUTHORITIES**</u>

## CASES

*360Training.com, Inc. v. United States*, 104 Fed. Cl. 575 (2012) ................................................................ 22

*Abington Heights Sch. Dist. v. Speedspace Corp.*, 693 F.2d 284 (3d Cir. 1982) ...................................... 15

*Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 161 (2011) ................................................................ 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 13

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009) ................................................ 16

*Axion Corp. v. United States*, 68 Fed. Cl. 468, 476 (2005) .......................................................................... 26

*Bailey v. United States*, 54 Fed. Cl. 459 (2002) ........................................................................................ 26

*Baker v. United States*, 50 Fed. Cl. 483 (2001) ........................................................................................ 28

*Bank of Guam v. United States*, 578 F.3d 1318 (Fed. Cir. 2009) .............................................................. 25

*Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375 (Fed. Cir. 2009) .................................. 30

*Camp v. Pitts*, 411 U.S. 138 (1973) ............................................................................................................ 16

*Capitol Boulevard Partners v. United States*, 31 Fed. Cl. 758 (1994) ........................................................ 21

*Carter v. United States*, 102 Fed. Cl. 61 (2011) ........................................................................................ 26

*Castle-Rose Inc. v. United States*, 99 Fed. Cl. 517 (2011) .......................................................................... 22

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) ................................................................ 29

*Chavez v. United States*, 18 Cl. Ct. 540 (1989) .......................................................................................... 31

*Creation Upgrades, Inc. v. United States*, No. 09-788C, 2010 U.S. Claims LEXIS 73
   (Fed. Cl. Mar. 24, 2010) ........................................................................................................................ 21

*Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008) ............................................ 22

*District of Columbia v. United States*, 67 Fed. Cl. 292 (2005) .................................................................. 26

*Doe v. United States*, 106 Fed. Cl. 118, 122 (2012) .................................................................................. 13

iii

*Emeco Indus., Inc. v. United States*, 202 Ct. Cl. 1006 (Ct. Cl. 1973) ................................................... 31, 32

*Empresas Electronics Walser, Inc. v United States*, 650 F.2d 286 (Ct. Cl. 1980) ..................................... 35

*Estate of Bogley v. United States*, 514 F.2d 1027 (Ct. Cl. 1975) .................................................................. 25

*Foster v. United States*, 111 Fed. Cl. 658 (2013) ........................................................................................ 13

*Franklin Sav. Corp v. United States*, 56 Fed. Cl. 720 (2003) ..................................................................... 16

*George H. Whike Constr. Co. v. United States*, 140 F. Supp. 560 (Ct. Cl. 1956) ................................ 35, 38

*Hercules, Inc. v. United States*, 516 U.S. 417 (1996) ............................................................... 13, 30, 31, 36

*Heyer Prods Co. v. United States*, 140 F. Supp. 409 (Ct. Cl. 1956) ........................... 13, 17, 18, 20, 21, 23

*Hunt Trust Estate v. United States*, 470 F.3d 1044 (Fed. Cir. 2006) ........................................................... 26

*Hwang v. United States*, 94 Fed. Cl. 259 (2010) ......................................................................................... 13

*Info. Scic. Corp v. United States*, 85 Fed. Cl. 195 (2008) ........................................................................... 16

*Int'l Air Response v. United States*, 75 Fed. Cl. 604 (2007) ....................................................................... 35

*J.C. Pittman & Sons, Inc. v. United States*, 317 F.2d 366 (Ct. Cl. 1963) ................................................... 31

*J.C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503 (2012) ................................................................... 29

*Joint Venture of Comint Sys. Corp v. EyeIT.com, Inc*, 100 Fed. Cl. 159 (2011) ....................................... 16

*Keco Indus., Inc. v. United States*, 428 F.2d 1233 (Ct. Cl. 1970) ............................................................... 20

*L-3 Commc'ns Integrated Sys., L.P. v. United States*, 94 Fed. Cl. 394 (2010) ........................................... 21

*La Van v. United States*, 382 F.3d 1340 (Fed. Cir. 2004) ........................................................................... 25

*Last Chance v. United States*, 12 Cl. Ct. 551 (1987) ................................................................................... 28

*Law Mathematics & Tech, Inc. v. United States*, 779 F.2d 675 (Fed. Cir. 1985) ....................................... 37

*Linda Newman Constr. Co. v. United States*, 48 Fed. Cl. 231 (2000) .................................................... 32, 35

*Litchtefeld-Massaro, Inc. v. United States*, 17 Cl. Ct. 67 (1989) ................................................................. 36

*Maher v. United States*, 314 F.3d 600 (Fed. Cir. 2002) ............................................................ 25

*Manloading & Mgmt Assocs., Inc. v. United States*, 198 Ct. Cl. 628 (1972) ............................ 38

*Mastrolia v. United States*, 91 Fed. Cl. 369 (2010) .................................................................. 13

*N. Am. Asbestos Corp. v. Superior Court*, 179 Cal. Rptr. 889 (Cal. Ct. App. 1982) ................. 15

*N.Y. Mail & Newspaper Transp. Co. v. United States*, 154 F. Supp. 271 (Ct. Cl.) .................... 36

*New America Shipbuilders v. United States*, 871 F.2d 1077 (Fed. Cir. 1989) ..................... 23, 24

*OAO Corp. v. United States*, 17 Cl. Ct. 91 (1989) .................................................................... 36

*Orion Tech., Inc. v. United States*, 101 Fed. Cl. 492 (2011) ..................................................... 16

*Ozdemir v. United States*, 89 Fed. Cl. 631 (2009) .................................................................... 21

*Pasteur v. United States*, 814 F.2d 624, 628 (Fed Cir. 1987) ................................................... 23

*Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) ............................................................... 13

*Peninsular & Oriental Steam Nav. Co. v. Overseas Oil Carriers, Inc.*, 553 F.2d 830 (2d Cir. 1977) ....... 30

*Porter v. United States*, 496 F.2d 583 (1975) .......................................................................... 31

*Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010) ....................... 29

*Prestex v. United States*, 320 F.2d 367 (Ct. Cl. 1963) ............................................................. 36

*Prineville Sawmill Co. v. United States*, 859 F.2d 905 (Fed. Cir. 1988) ................................... 24

*Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768 (2009) .......................................... 21

*Refine Construction Co. v. United States*, 12 Cl. Ct. 56 (1987) .......................................... 19, 23

*Resource Conservation Group v. United States*, 597 F.3d 1238 (Fed. Cir. 2010) .......... 20, 21, 22

*Ridge Runner Forestry v. Veneman*, 287 F.3d 1058 (Fed. Cir. 2002) ....................................... 26

*Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970) .................................... 25

*Schism v. United States*, 316 F.3d 1259 (Fed. Cir. 2002) .................................................... 25, 31

*Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367 (Fed. Cir. 2013) ................................................. 4

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001) ........................................... 29

*Southfork Sys., Inc. v. United States*, 141 F.3d 1124 (Fed. Cir. 1998) ...................................... 29

*Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994 (Ct. Cl. 1972) ................................. 35

*Township of Saddlebrook v. United States*, 104 Fed. Cl. 101 (2012) ................................... 36, 37

*Tree Farm Development Corporation v. United States*, 585 F.2d 493 (Ct. Cl. 1978) .. 18, 19, 21, 26, 27, 33

*United States v. Amdahl Corp.*, 786 F.2d 387 (Fed. Cir. 1986) .................................................. 36

*Urban Data Sys., Inc. v. United States*, 699 F.2d 1147 (Fed. Cir. 1983) .................................... 36

*Watson v. United States*, 2007 U.S. Claims LEXIS 430 (Fed. Cl. Jan. 26, 2007) ....................... 16

*XP Tech. v. United States*, No. 12-cv-00774-MMS (Fed. Cl. Dec. 16, 2013) ............................ 14

*XP Vehicles*, No. 13-cv-37 (D.D.C. Sept. 18, 2013) ................................................................... 14

*Yosemite Park & Curry Co. v. United States*, 582 F.2d 552 (Ct. Cl. 1978) ................................ 36

*Zacharin v. United States*, 213 F.3d 1366 (Fed. Cir. 2000) .......................................... 32, 35, 36

## STATUTES

28 U.S.C. § 1491 .......................................................................................................................... 12

28 U.S.C. § 1491(a)(1) ................................................................................................................. 12

28 U.S.C. § 1491(b)(1) ................................................................................................................. 21

42 U.S.C. § 17013(b) ...................................................................................................................... 3

42 U.S.C. § 17013(d) .................................................................................................................... 33

42 U.S.C. § 17013(d)(1) ........................................................................................................... 4, 28

42 U.S.C. § 17013(d)(3) ........................................................................................... 2, 4, 18, 24, 28

42 U.S.C. § 17013(d)(4)(A) .......................................................................................................... 24

42 U.S.C. § 16511 ..................................................................................................... 2, 5

Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320,
   110 Stat. 3870 (1996) ............................................................................................ 21

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, § 136,
   121 Stat. 1492, 1514 (2007) ................................................................................ 3, 28

Energy Policy Act of 2005, Pub. L. No. 109-58, § 1703, 119 Stat. 594, 1120 (2005) ................................ 3

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat 594 (2005) ....................................... 37

## REGULATIONS

10 C.F.R. § 609.10(b) ............................................................................................... 35

10 C.F.R. § 609.6(19) ............................................................................................... 37

10 C.F.R. § 609.7(a) .................................................................................................. 5

10 C.F.R. § 611 ........................................................................................................ 18

10 C.F.R. § 611.100(a) ............................................................................................... 4

10 C.F.R. § 611.100(c) ............................................................................................... 4

10 C.F.R. § 611.101 ............................................................................................... 4, 18

10 C.F.R. § 611.103 ............................................................................................ 4, 24 27

10 C.F.R. § 611.103(b) ............................................................................................... 5

10 C.F.R. § 611.105(b) ............................................................................................... 27

10 C.F.R. § 611.106 .................................................................................................... 4

10 C.F.R. § 611.107(b) ............................................................................................... 24

74 Fed. Reg. 63,544 (Dec. 4, 2009) ............................................................................... 5

74 Fed. Reg. 63,549 ................................................................................................... 35

Cal. Corp. Code § 2001(h) ........................................................................................... 15

Cal. Corp. Code §§ 1903(c) ................................................................................................ 15

## OTHER AUTHORITIES

Aaron Nathans, *Energy Secretary: Fisker Buyer Must Manufacture in U.S.*,
Del. Online (Jan. 22, 2014) ............................................................................................... 6

DOE Loan Guarantee Program, Background Briefing for Webinar on NEPA & the DOE Loan Guarantee
Program, lpo.energy.gov, available at http://lpo.energy.gov/wp-content/uploads/2010/09/BB-NEPA-
Webinar.pdf (last visited Feb. 14, 2014) ............................................................................ 18

Department of Energy Loan Guarantee Program, FAQs, lpo.energy.gov,available at
http://lpo.energy.gov/top-10-faqs/nepa-faq/ (last visited Feb. 14, 2014) .............................. 18

Peg Brickley, *Fisker Auto Gets Final Court OK On $13.1 Million Bankruptcy Loan*, Wall St. J.
(Jan. 24, 2014) ................................................................................................................ 6

H. Comm. Oversight, *The Department of Energy's Disastrous Management of Loan Guarantee Programs*
(Mar. 20, 2012) ............................................................................................................... 2

U.S. Gov't Accountability Office, GAO 13-331R, Status of DOE Loan Programs (2013) ......................... 4

William Boyd & Robert Huffman, *The Treatment of Implied-in-Law & Implied-in-Fact Contracts &
Promissory Estoppel in the United States Claims Court* ..................................................... 36

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

|  |  |  |
|---|---|---|
| XP VEHICLES, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | No. 12-774C (Judge Sweeney) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | Dated: February 18, 2014 |

_____

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 5.4 of the Rules of the United States Court of Federal Claims (RCFC), Plaintiffs XP Vehicles, Inc. (XPV) and Limnia, Inc. (Limnia) respectfully oppose the Government's motion to dismiss the second amended complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

## QUESTIONS PRESENTED

1. Does this Court have subject matter jurisdiction over claims arising from the Government's failure to fairly consider admittedly qualified loan applications?

2. Does this Court have subject matter jurisdiction to estop the Government from using secret "merit criteria" to deny admittedly qualified Advanced Technology Vehicle Manufacturing (ATVM) program loan applications?

3. Does this Court have jurisdiction to estop the Government from refusing to accept a late loan guarantee application fee submitted only because the Government said it would accept the fee after the stated deadline?

4. Have Plaintiffs sufficiently pled their claims?

## STATEMENT OF THE CASE

Treating loan and loan guarantee programs, created by the Congress to support American manufacturing and to reduce dependence on foreign oil, as conduits to funnel billions in taxpayer funds to political insiders and cronies, the Department of Energy (DOE) wrongly refused to fairly consider Plaintiffs' ATVM loan applications.  For example, contrary to the authorizing statute and to its own regulations, DOE denied XPV's admittedly qualified ATVM loan application using secret "merit criteria."  Also, DOE promised to waive Limnia's loan guarantee application fee and then broke its promise.

Congress charged DOE with running open, honest, and fair loan programs. Yet it failed to do so.  A House Oversight Committee report highlighted the corrosive harm done by DOE, and encapsulated Plaintiffs' injuries, when it said:

> To the extent government loan programs proceed, the government must maintain the highest integrity in the allocative process.  If government fails to impose a fair and impartial loan process that prioritizes genuinely eligible borrowers, then the government further misallocates capital within the [federally] subsidized industry, increasing economic harm.  Relatively better businesses may suffer losses while waiting for subsidies that never materialize.  Lower quality firms, with strong political ties, may succeed in gaining government support with inferior products . . . . *The failure to maintain integrity and abide by the law when implementing the DOE loan program significantly impacts those that failed to receive subsidies as well.*

Ex. 1 at 21 (H. Comm. Oversight, *The Department of Energy's Disastrous Management of Loan Guarantee Programs* (Mar. 20, 2012) (emphasis added) ("Oversight Report")).

Congress did *not* provide DOE unfettered discretion to reject applicants or authorize it to deny funds to admittedly qualified applicants using a secret criteria-less "merit review."  *See* 42 U.S.C. § 17013(d)(3); 42 U.S.C. §§ 16511 *et seq*.  Moreover, Congress did *not* authorize DOE to bend the rules and arbitrarily stop making loans to qualified applicants or to prioritize the loan

applications of insider corporations over those, like XPV and Limnia, that filed first and played

by the rules. Yet the Government did all of these things and now claims that this Court lacks

jurisdiction to check its abuse.

The Government is wrong.  This Court's jurisdiction over implied-in-fact contract claims

arising from the Government's failure to run a fair and level procurement is long-settled.  Given

the statutory scheme, the fact that the government monies here are in the form of loans or loan

guarantees changes nothing.  This Court has subject matter jurisdiction over this case, Plaintiffs'

claims are sufficiently pled, and DOE's efforts to shelter its cronyism and abuse from

independent review should be rejected.

## I.      THE STATUTORY AND REGULATORY FRAMEWORK

Congress created and funded the ATVM loan and Section 1703 loan guarantee (LG)

programs to free America from its dependence on foreign oil and to promote American

technology and manufacturing companies.  *See* Energy Independence and Security Act of 2007,

Pub. L. No. 110-140, § 136, 121 Stat. 1492, 1514 (2007) (codified in 42 U.S.C. § 17013 *et seq.*)

(EISA) (creating ATVM program); Energy Policy Act of 2005, Pub. L. No. 109-58, § 1703, 119

Stat. 594, 1120 (2005) (codified in 42 U.S.C. §§ 16511 *et seq.*) (creating LG program).  DOE

was directed to administer both programs.

Congress provided DOE with clear ATVM loan rules of the road.  It said DOE "*shall*"

lend automobile manufacturers, ultra efficient vehicle manufacturers, and component suppliers to

pay thirty percent of the cost to reequip, expand, or establish a U.S. manufacturing facility and

for engineering integration performed in the United States "of qualifying vehicles, ultra efficient

vehicles, and qualifying components."  42 U.S.C. § 17013(b).[1]  It also said that, subject to

---

[1] A "shall" in the statutory language is mandatory language denoting the imperative.  *Sharp*

availability of appropriated funds, DOE "*shall* [lend] not more than $25,000,000,000" to

"eligible individuals and entities," up to the limit of the statutory authority and to the extent that

eligible applicants apply.  *Id.* § 17013(d)(1) (emphasis added).  Finally, it said DOE "*shall* select

eligible projects to receive loans in cases" in which, as determined by DOE, "the award

recipient— (A) is financially viable without the receipt of additional Federal funding associated

with the proposed project; (B) will provide sufficient information [for DOE] to ensure that the

qualified investment is expended efficiently and effectively; and (C) has met such other criteria

as may be established and *published* [by DOE]."  *Id.* § 17013(d)(3)(emphasis added).  DOE

published ATVM regulations in 10 C.F.R. Part 611, creating a three-part review.  *See* 10 C.F.R.

§ 611.103.  First was screening.  To pass this stage, the applicant was required to be either a

manufacturer of automobiles or of qualifying components, 10 C.F.R. § 611.100(a), and to be

financially viable.[2]  *Id.* at § 611.100(c) (setting forth factors DOE was supposed to consider when

assessing an applicant's financial viability).  Second was a National Environmental Policy Act

review requiring applicants to prepare a costly environmental report.  *See id.* §§ 611.101,

611.106.  Third, for applications that satisfied steps one and two, there was promised "a

substantive review" based upon factors that included technical merit, fuel economy, petroleum

use reduction, "Technical Program Factors" (such as economic development and diversity in

---

*Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1373 (Fed. Cir. 2013).  However, DOE still has
approximately $16.6 billion of unused ATVM lending authority and it refuses to make any
additional loans.  *See* Ex. 2 at 2 (U.S. Gov't Accountability Office, GAO 13-331R, Status of
DOE Loan Programs (2013)).

[2] As part of the financial application requirements, applicants were required to include: (1) a
detailed estimate of project costs; (2) the methodology used to produce that estimate; (3) a
detailed financial plan showing funding, equity, and debt; (4) a business plan that included
income statements, balance sheets, and cash flows; (5) a market analysis; (6) the company's
historical financial statements, as audited by an independent certified public accountant; *and* (7)
an analysis that the applicant was financially viable based upon relevant filings made with the
U.S. Securities and Exchange Commission.  *Id.* § 611.101.

technology, company, risk, and geographic location), and the adequacy of proposed security for the loan. *Id.* § 611.103(b).

Congress also set clear limits on DOE's discretion to deny LG program applicants by defining eligible projects and setting loan and repayment terms. 42 U.S.C. §§ 16511 *et seq*. Here, too, DOE promulgated application rules. 74 Fed. Reg. 63,544 (Dec. 4, 2009). DOE promised applicants a "competitive process," 10 C.F.R. § 609.7(a), suggesting fairness and transparency. In reality, DOE was anything but competitive, fair, or transparent in its administration of these programs.

## II.    DOE IMPROPERLY POLITICIZED THE PROGRAMS

Contrary to its congressional authorization, DOE officials infected the loan programs with political cronyism and treated taxpayer-funded programs as a piggybank for the politically-connected and powerful, thereby harming promising manufacturers and qualified companies that lacked friends in the Administration. Sec. Am. Compl. ¶¶ 83–118 (hereinafter Compl.). The House Oversight Committee and the House Energy and Commerce Committee, as well as the Government Accountability Office, each investigated DOE and found many problems, including a pattern of political pressure that moved DOE to bend its published rules to favor high-profile politicians and government favorites. *Id.* ¶¶ 112–13.

For example, the House Oversight Committee's 2012 report released emails demonstrating DOE had departed from any sense of fairness or competition: "I am growing increasingly worried about a fast track process imposed on us at the POTUS level . . . The work to date . . . is totally being done on the fly and is being used by other agencies to impose theological views . . . the process that is being designed is pure crap." Ex. 3 (Oct. 30, 2010 email from James C. McCrea, DOE credit advisor, to Jonathan Silver, Executive Director of DOE

Loan Programs).  In another email, Mr. McCrea suggested that then-Secretary Chu ordered loan program staffers to make sure that a chosen recipient would receive a loan, stating that Secretary Chu was "adamant that this transaction is going to OMB by the end of the day Fri[day] if not sooner.  [This is n]ot a way to do things but a direct order."  Compl. ¶ 112; *id.* Ex. 17.  Another internal email stated that "DOE has made a political commitment to get Unistar through the approval process by 6/15."  *Id.* ¶ 112; *id.* Ex. 16; *see also id.* ¶ 113.

The House Energy and Commerce Committee's 2012 report on the LG program found that DOE ignored red flags about Solyndra's financial condition and had failed to consult with the Department of the Treasury before awarding loan guarantees.  Ex. 4 at 129–33 (H. Comm. on Energy & Commerce, 112th Cong., *The Solyndra Failure* (Aug. 2, 2012)).  DOE's failures resulted, in part, from the behind-the-scenes activities of Mr. George Kaiser, a bundler for President Obama's 2008 campaign, who happened to be Solyndra's primary investor.  *See id.* at 5.

DOE's ATVM program administration was equally skewed.  It awarded only five loans to a tight circle of prominent and well-connected companies—the Ford Motor Company, Nissan, Tesla, The Vehicle Production Group, and Fisker.[3]  Compl. ¶¶ 35, 59, 90–109.  After lending over *eight billion dollars* to political favorites, DOE stopped considering applications and ceased making ATVM loans.  *Id.* ¶ 35; *see* Ex. 2 (GAO 13-331R).  By freezing its ATVM program, the agency was able to protect its politically-connected "winners" from competition with forward-thinking entrepreneurs like XPV, Limnia, and others.

---

[3] Fisker, after receiving $168 million in loans from DOE, declared bankruptcy and quit making cars.  Its assets, including former DOE ATVM loan funds, are being sold at auction.  *See* Ex. 5 (Peg Brickley, *Fisker Auto Gets Final Court OK On $13.1 Million Bankruptcy Loan*, Wall St. J. (Jan. 24, 2014); Aaron Nathans, *Energy Secretary: Fisker Buyer Must Manufacture in U.S.*, Del. Online (Jan. 22, 2014)).

### III.      XPV'S AND LIMNIA'S ODYSSEY

DOE's politically-motivated abuse of the ATVM and LG loan programs put XPV out of business and hamstrung Limnia.  Compl. ¶¶ 1, 9, 19, 67–82, 114–18.  Relying upon DOE's solicitations, promises, regulations and conduct, XPV and Limnia hired workers, contractors, attorneys, and accountants; sought out and secured manufacturing facilities and marketing opportunities; and spent thousands of hours and hundreds of thousands of dollars navigating DOE's requirements.  They met all of the statutory and regulatory criteria for funding and were told, verbally and in writing, by authorized government officials, that loans would be made and applications accepted.  But the loan programs were fatally politicized to benefit government insiders and fundraising "bundlers."  *See id.* ¶¶ 9, 47–63, 84–109, 112–13, 117–18; *see also* Ex. 1.  Therefore, Plaintiffs' contractual rights to fair consideration and to loan funds were denied.

XPV was an advanced technology vehicle company.  Compl. ¶¶ 1, 13–18.  Responding to DOE's ATVM loan solicitation, XPV applied for a $40 million loan to mass produce an advanced, electric SUV-style vehicle using polymer plastics and foam pressure membranes wrapped around a lightweight alloy frame.  *Id.* ¶¶ 12, 14, 17.  XPV projected that the company would sell a base model SUV to families for approximately $20,000, *id.* ¶¶ 15, 48, and had prepared for a high volume of government fleet sales, *id.* ¶ 49.  The company offered over $100 million in collateral to secure the loan.  *Id.* ¶ 13.

Limnia is an advanced-technology, "green energy" company that has worked with DOE's own Sandia National Laboratory since 2002 to develop an advanced energy storage system for electric cars.  Over the past decade, DOE has provided grant, technical support, and validation services in connection with Limnia's work with Sandia.  *Id.* ¶¶ 69, 71.  Limnia applied for LG

funding and for a $15 million ATVM loan to build a battery system.  Sandia wanted to be, and was named as, one of Limnia's key subcontractors for DOE's technical merit review.  *Id.* ¶ 71.

DOE officials led XPV to believe that DOE's review procedure would be consistent with normal industry standards, meaning that it would take only a matter of weeks to determine XPV's eligibility for funding.  *Id*. ¶ 22.  However, DOE delayed for months, setting aside XPV's application in favor of ones from politically-connected insiders.  *Id*. ¶¶ 23–25.

Beginning on December 31, 2008, DOE told XPV that its ATVM application was deemed "substantially compete," *id*. ¶¶ 20, 27, 57, and DOE staff later deemed XPV a "qualified applicant," *id.* ¶ 21.  Indeed, DOE's own Excel comparison matrices in December of 2008 and March of 2009 placed XPV in the top five percent of all applicants.  *See id.*  Then, at the end of April of 2009, DOE notified XPV that its application had been assigned to a technical eligibility and merit review team, *id.* ¶ 27, only to later report that XPV had passed the technical review stage and that "everything looked good," *id.* ¶ 29.

While awaiting DOE's decision, XPV repeatedly offered to supply DOE additional technical information and to engage XPV's technical team for in-depth interviews with DOE decisionmakers.  *Id.* ¶¶ 23, 31.  DOE repeatedly declined.  *See id.*  Yet, XPV soon discovered that two other applicants with very close Executive Branch ties were receiving special assistance from DOE with their applications.  *Id.* ¶¶ 30, 89–116.  XPV requested similar treatment, but was denied; ostensibly, XPV's application was so good that special assistance was unnecessary.  *Id.* ¶ 31.  By June 15, 2009, DOE officials knew that XPV was a semi-finalist for the "America's Most Promising Companies" list in Forbes Magazine, *id.* ¶ 32, when they announced that DOE was awarding eight billion dollars in loans to three companies, all of which had (and have) close government ties.  *Id.* ¶ 35.

Five days later, XPV wrote DOE, asking it to explain why it had not yet acted on XPV's application despite being assured that the company had passed all three stages of review.  *Id.* ¶¶ 35–36.  Over the next seven weeks, DOE's ATVM program staff repeatedly assured XPV that everything was on track and that XPV met every criterion for a loan.[4]  *Id.* ¶ 37.

On August 21, 2009, XPV received a letter from the ATVM Loan Program Director Lachlan Seward denying its application.  *Id.* ¶ 38.  Mr. Seward said that although DOE deemed

---

[4] XPV and Limnia were not alone in their experience.  Bright Automotive's story is instructive. In a February 2012 letter to DOE withdrawing its ATVM application it wrote as follows:

> Today Bright Automotive, Inc. . . . [has] been forced to say "uncle". . . . In good faith we entered the ATVM process . . . in December of 2008. . . .  At that time, our application was deemed "substantially complete."  As of today, we have been in the "due diligence" process for more than 1175 days. . . . We were told by the DOE in August of 2010 that Bright would get the ATVM loan "within weeks, not months" after we formed a strategic partnership with General Motors [a government crony company] as the DOE had urged us to do. . . . Each time your team asked for another new requirement, we delivered with speed and excellence.

> Then, we waited and waited; staying in this process for as long as we could after repeated, yet unmet promises by government bureaucrats.  We continued to play by the rules, even as you and your team were changing those rules constantly— seemingly on a whim. . . . Because of ATVM's distortion of U.S. private equity markets, the only opportunities for 100 percent private equity markets are abroad. We made it clear we were an American company, with American workers developing advanced, deliverable and clean American technology. . . . [The ATVM] program "lacked integrity"; that is, it did not have a consistent process and rules against which private enterprises could rationally evaluate their chances and intelligently allocate time and resources against that process.  There can be no greater failing of government than to not have integrity when dealing with its taxpaying citizens.

> It does not give us any solace that we are not alone in the debacle of the ATVM process . . . . countless hours, efforts and millions of dollars have been put forth by a multitude of strong entrepreneurial teams and some of the largest players in the industry to advance your articulated goal of advancing the technical strength and clean energy breakthroughs of the American automotive industry.  These collective efforts have been in vain as the program failed to finance both large existing companies and younger emerging ones alike.

Ex. 6 at 1–3 (Letter from Reuben Munger and Mike Donoughe, Bright Automotive, to Steven Chu, Sec'y of Energy (Feb. 28, 2012)).

XPV "eligible" for a loan, DOE could not lend to all eligible applicants and that XPV had failed the agency's "merit review."  Mr. Seward did not disclose the criteria for this "review," despite explaining that XPV had passed the technical review.  *Id.* ¶ 39.  The criteria remain a secret to this day.  *Id.*  XPV immediately contacted DOE again and requested the merit review documents and an explanation for DOE's determination.  *Id.* ¶¶ 26, 55, 64, 67, 73, 82, 117(c).

Hearing no response, XPV began to climb DOE's chain of command by calling a DOE staff member, Chris Foster, who recounted verbatim the reasons for XPV's "merit review" failure.  *Id.* ¶¶ 41–45.  Mr. Foster stated that the reasons were XPV's electric SUV did not use E85 gasoline, XPV did not plan for government fleet sales and XPV's advanced technology was "too futuristic."  *Id.* ¶ 45.  XPV was surprised by the explanation because its SUV was purely powered by electricity and did not use *any* gasoline; its business plan explicitly contemplated government fleet sales of its advanced technology vehicles; and Congress's stated intent in the ATVM program was to seek *new* solutions that would reduce dependence on foreign oil.  *Id.* ¶¶ 47–53.  Mr. Seward then walked in and abruptly terminated the conversation by telling Foster to hang up the phone and end the debriefing.  *Id.* ¶ 53.

XPV heard nothing but silence from DOE after the call.  *Id.* ¶ 54.  Accordingly, XPV climbed further up the chain of command by sending then-Secretary Chu a letter requesting reconsideration of the agency's decision, since the reasons DOE offered for its denial were completely inaccurate.  *Id.* ¶ 55.  XPV asked Mr. Chu to explain why DOE staff had given XPV repeated assurances of approval, while repeatedly rejecting XPV's offers to provide additional information to the agency.  *Id.*; *see id.* ¶ 40.  XPV also asked how XPV failed to satisfy the merit review criteria.  *Id.* ¶ 55.  Finally, XPV asked Chu to explain why politically-connected insiders like Tesla and Fisker had received priority during the agency's application review process, DOE

assistance in drafting their applications and ATVM loan funds, while XPV was rejected under

unknown "merit criteria."  Mr. Chu did not answer.  *Id*. ¶¶ 54–56.

Many weeks passed, and Mr. Seward ultimately responded to XPV's letter to Mr. Chu.

Mr. Seward's response, ostensibly an attempt to put an end to this matter, only raised more

questions.  To begin with, Mr. Seward again failed to directly answer XPV's questions and,

instead, he offered new "cut and paste" pretexts for the denial, apparently from another

boilerplate denial letter.  Indeed, the font size did not even match the rest of the letter XPV

received.  *Id.* ¶¶ 56–64.

Remarkably, Mr. Seward did *not* say that XPV failed to meet the statutory or regulatory

requirements.  Specifically, he did *not* say that XPV failed to offer adequate security, failed to

demonstrate a reasonable prospect of repayment, or failed to demonstrate its capability to build,

distribute, or sell its electric SUV.  *Id.* ¶ 65.  In fact, the alleged "reasons" for denial had,

notwithstanding nearly a year of "underwriting," never raised with XPV, and DOE had never

asked XPV's management and engineers for discussion, clarification, or explanation with respect

to the technical merit of XPV's submission.  *Id.* ¶¶ 39–66.

Instead, DOE officials denied XPV a fair shake.  *Id.* ¶¶ 30–31, 89–118.  DOE used

opaque and unpublished "merit review" criteria to steer taxpayer funds into the pockets of

politically favored cronies.  *Id.* ¶¶ 83–84.  Given that the ATVM loan program had distorted the

private equity market and dried up other sources of investment venture capital, DOE's actions

wrongfully denied XPV private funding and caused the company to collapse.  *See id.* ¶ 9.

Limnia fared no better.  Although Limnia made a battery system for electric advanced-

technology vehicles, Mr. Seward initially denied the company's ATVM loan application because

the battery system was not "designed for installation in an advanced technology vehicle."  *Id.*

¶¶ 69–70.  Limnia responded, advising Mr. Seward that the patents showed the system was *specifically* developed for advanced technology vehicles.  *Id.* ¶ 71.  Mr. Seward again denied the application because the technology was "not installed in an advanced technology vehicle."  *Id.* ¶ 72.  Limnia responded that the system in question *had to be* installed in an advanced technology vehicle to operate.  *Id.*  DOE did not respond.  *Id.* ¶ 73.

Limnia's LG program application was also doomed.  *Id.* ¶¶ 75–82.  About a month before the application deadline, Limnia participated in a teleconference with Chu, Department of the Interior Secretary Kenneth Salazar, and Mr. John Podesta, the former President for the Center for American Progress and a co-chairman of the Obama-Biden transition team.  *Id.* ¶ 76.  On this call, Mr. Chu invited Limnia to submit an application by promising to waive the "unduly onerous and burdensome" application fee.  *Id.*  Limnia relied on this promise and submitted its application to DOE without the $18,000 fee.  *Id.* ¶ 77.  Yet on the day applications were due, DOE reneged on Mr. Chu's promise, frustrating Limnia's ability to make a timely payment, even though Limnia had the cash on hand.  *Id.* ¶ 77–79.  Limnia was thus booted out of the application pool because the company had not paid the fee, despite the fact that it had the money available, was prepared to wire it to DOE, and DOE knew this to be the case.  *Id.* ¶ 79–81.

## STANDARD OF REVIEW

The Tucker Act, 28 U.S.C. § 1491, grants jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  This jurisdiction extends to contracts implied-in-fact and to claims based on the government's breach of its duty to fairly consider a bid or application.  *See Hercules, Inc. v. United States*, 516 U.S.

417, 423–24 (1996) (Tucker Act jurisdiction for contracts implied-in-fact)); *Heyer Prods Co. v. United States*, 140 F. Supp. 409, 413–14 (Ct. Cl. 1956) (government's duty to fairly consider within Court's ambit).

Upon receiving an RCFC 12(b)(1) motion, "the Court accepts as true the undisputed allegations of the complaint and draws all reasonable inferences in favor of the plaintiff." *Foster v. United States*, 111 Fed. Cl. 658, 661 (2013). The plaintiff must establish facts sufficient to demonstrate jurisdiction "by a preponderance of evidence," but the motion to dismiss should be granted only when it is *clear beyond a doubt* that there is no set of facts that would enable the court to grant relief. *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (emphasis added). The Court may look at evidence outside of the pleadings to determine its jurisdiction. *Doe v. United States*, 106 Fed. Cl. 118, 122 (2012).

In reviewing a RCFC 12(b)(6) motion, the Court must accept as true all allegations in the complaint and "indulge all reasonable inferences" in Plaintiffs' favor. *Hwang v. United States*, 94 Fed. Cl. 259, 268 (2010). The complaint must assert facts sufficient to state "a claim to relief that is plausible on its face." *Mastrolia v. United States*, 91 Fed. Cl. 369, 376 (2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facial plausibility does not require plaintiff to meet a "probability requirement" but rather requires a plaintiff to demonstrate by "more than a sheer possibility" that the defendant acted unlawfully. *Id.*

## ARGUMENT

After ignoring its duty to "impose a fair and impartial loan process," Ex. 1 at 21, the Government now argues in different forums that there exists no legal remedy for DOE's political

favoritism and that there is no relief to be had for a company harmed by a crooked federal program. *Compare* Mot. Dismiss, *XP Tech. v. United States*, No. 12-cv-00774-MMS (Fed. Cl. Dec. 16, 2013), ECF No. 36, *with* Individual Defs' & Official Cap. Defs.' Mots. Dismiss, *XP Vehicles*, No. 13-cv-37 (D.D.C. Sept. 18, 2013), ECF Nos. 27, 28.  Instead, the Government denies this Court's jurisdiction, arguing that XPV and Limnia had no contract, implied-in-fact or otherwise, there was no duty of good faith and fair dealing, Plaintiffs have insufficiently alleged equitable estoppel; and promissory estoppel is never justiciable in this Court.  That is, the Government says that it may solicit, encourage, and induce applicants to spend hundreds of thousands of dollars proving their qualifications free from any contractual obligation to fairly consider or any duty to run a level program, and that it has the discretion to funnel billions of taxpayer dollars to the powerful and connected, while applicants who trust the system's integrity, instead of wealthy former politicians and big political donors, are out of luck.

This unfair and biased favoritism is not lawful.  Government cronyism, abuse, and disregard for the law are subject to the check of judicial review.  The Government's motion should be denied, and the administrative record should be once and for all revealed by the agency, and this case should proceed to the adjudication on the merits.

XPV and Limnia brought only good ideas to the table, not relationships with insiders or fundraising "bundlers," and so they never had a fair chance.  Instead, they were induced by the Government to spend enormous sums of time and money for the privilege of participating in a loan application process that was nothing more than a fan dance to cover the transfer of billions of taxpayer dollars to the politically powerful, privileged, and connected.  *See* Compl. ¶¶ 33, 89–113; Ex. 1 at 2–5, 9-13.  Yet the Government's rationale for dismissal is that Plaintiffs' first and second claims for relief fail because they are "clearly" promissory estoppel and non-justiciable,

Mot. Dismiss 13–21, that Plaintiffs' third and fourth claims for relief fail because the Government owed no contractual duty or obligation of good faith implied-in-fact or otherwise to fairly consider Plaintiffs' ATVM and Section 1703 applications, *id.* at 21–25, and that XPV lacks standing because the Government drove it out of business.

Given the statutory and regulatory framework within which the Government's conduct must be objectively viewed and considered, well-established authorities require—and basic notions of justice and fairness demand—that the Government is estopped from denying its contracts with XPV and Limnia, implied-in-fact, to lend and to accept their applications and that the Government be held accountable for its breach of contractual duties to fairly consider Plaintiffs' ATVM and LG program applications.

## I.   THE GOVERNMENT HAD A DUTY TO FAIRLY CONSIDER PLAINTIFFS' ATVM LOAN PROGRAM APPLICATIONS AND SO THE THIRD AND FOURTH CLAIMS FOR RELIEF STAND.

With respect to Plaintiffs' third and fourth claims for relief, the Government argues that XPV[5] and Limnia "have not established that any implied-in-fact contract existed between themselves and DOE," because they have not alleged "any of the elements required to establish the existence of an implied-in-fact contract," notably consideration.  Mot. Dismiss 21–22.  The

---

[5] The Government argues that XPV, as a dissolved corporation, lacks standing, and therefore capacity, to sue for the recovery of money under California state law.  Mot. Dismiss 18.  To the contrary, California state law permits a dissolved corporation to do "any and all things in the name of the corporation which may be proper or convenient for the purposes of winding up."  Cal. Corp. Code § 2001(h).  "Winding up" includes suing for monies due and for injuries arising before dissolution.  Cal. Corp. Code §§ 1903(c), 2001(e), 2010(a).  Dissolved corporations can sue for pre-dissolution injuries at any time.  *See, e.g.*, *N. Am. Asbestos Corp. v. Superior Court*, 179 Cal. Rptr. 889, 891–92 (Cal. Ct. App. 1982); *Abington Heights Sch. Dist. v. Speedspace Corp.*, 693 F.2d 284, 286 (3d Cir. 1982).  XPV's injuries here are the result of DOE's politicization of the ATVM program and its refusal to lend, all occurring before XPV dissolved.  Had DOE simply conducted a fair and level review of XPV's ATVM loan application using the established statutory and regulatory factors, then XPV would have been given a loan and would be in business today.  Compl. ¶¶ 9, 18–19, 64-65, 111, 114, 117–18.

Government argues that Plaintiffs cannot avail themselves of the implied duty to fairly and

honestly consider bids because the Complaint "does not extend to a noncompetitive claim for a

discretionary *grant* under any case law now available." *Id.* at 22, 24 (emphasis added).  Setting

aside whether these arguments have merit absent an administrative record[6] the Government's

arguments fail because the Court has jurisdiction to hear implied-in-fact contract claims under

the *Heyer* doctrine.[7]

---

[6] When a Government acquisition strategy is called into doubt, the Court is well-within its discretion to order the production of an administrative record.  *See, e.g., Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–81 (Fed. Cir. 2009).  The record "typically contains the materials developed and considered by an agency in making a decision subject to judicial review."  *Orion Tech., Inc. v. United States*, 101 Fed. Cl. 492, 494 (2011) (referencing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  Following the appellate court's ruling in *Axiom*, the essential question that this Court must determine is whether record evidence would "frustrate effective judicial review."  *Joint Venture of Comint Sys. Corp v. EyeIT.com, Inc*, 100 Fed. Cl. 159, 166 (2011) (citing *Axiom*, 564 F.3d at 1381 & *Pitts*, 411 U.S. at 142–43).  "What constitutes 'effective judicial review' or 'meaningful review' varies depending upon the circumstances of each case."  *Comint Sys.*, 100 Fed. Cl. at 168.

Prior to ruling upon the merits the Court "must have a record containing all the information upon which an agency relied when it made its decision, together with any documentation that reveals the agency's decision-making process."  *Id.*  Indeed, this Court is well within its authority to order the Government to file an administrative record, even if the Court determines this is not a procurement case.  *See e.g.*, *Watson v. United States*, 2007 U.S. Claims LEXIS 430, at *2 (Fed. Cl. Jan. 26, 2007); *Franklin Sav. Corp v. United States*, 56 Fed. Cl. 720, 737 (2003).  Since the Court's bid protest jurisdiction grew out of the *Heyer* line of cases, *Info. Scic. Corp v. United States*, 85 Fed. Cl. 195, 205 (2008), it would make sense for the Court to have the benefit of an administrative record here, just as it does in bid protests.  Here, the Court should order DOE to produce an administrative record of all the information it used and to produce any documents that reveal the agency's decision-making processes, including any of its purported "merit criteria."

[7] To hold that no implied contract exists under these circumstances would mean that DOE is permitted to: (1) solicit and induce loan applicants to submit applications absent any notion of good faith and fair dealing; (2) disregard the strictures of Congress and the agency's own regulations in doing so; (3) seek services, goods, and guarantees under the auspices of a loan program that appeared remarkably like a procurement competition operated under a different name; (4) keep companies operating under the mistaken impression that they have a fair chance to win the loan funds on the table, while expending substantial time and money to meet illusory agency standards, purportedly objective application requirements, and allegedly important financial and industrial criteria (*e.g.*, certified public accountant statements for certain financial aspects and SEC certifications, environmental assessments); (5) retain the supreme authority to

A. *Heyer* Controls.

This Court has jurisdiction over Plaintiffs' implied-in-fact contract claims based on the implied contractual duty to fairly consider. *Heyer Prods.*, 140 F. Supp. at 413–14. In *Heyer*, the plaintiff submitted the lowest bid for a contract with the Ordnance Tank Automatic Center, Ordnance Corps, United States Army (OTAC). *Id.* at 410. OTAC, however, chose a higher bidder and plaintiff sued claiming that OTAC's denial was retaliation for negative testimony against OTAC in a Senate hearing. *Id.* The court found that plaintiff sufficiently alleged arbitrary action and stated that "[i]t was an implied condition of the request for offers" that the government would fairly and honestly consider all bids. *Id.* at 412.

The Court's rationale for recognizing an implied contractual duty to fairly consider bids was based upon its concern that bidders might devote substantial time and money to preparing their bids even though the solicitation was actually a sham and the Government had already decided to award the contract to a favored bidder:

> No person would have bid at all if he had known that "the cards were stacked against him." No bidder would have put out $7,000 in preparing its bid . . . if it had known the [Government] had already determined to give the contract to [a favorite]. It would not have put in a bid unless it thought it was to be honestly considered. It had a right to think it would be. . . . The [Government] knew it would involve considerable expense to prepare models, photographs, diagrams and specifications and other things necessary to comply with the invitation, and so, when it invited plaintiff to incur this expense, it must necessarily be implied that it promised to give fair and impartial consideration to its bid, having in mind only the interest of the Government and not the interest of some favorite bidder.

*Id.* at 412-13.

---

deny qualified applicants a fairly-run technical evaluation panel; (6) choose applications based upon their political connections or campaign contribution history; and (7) deny that there exists any forum, judicial or otherwise, in which Plaintiffs may pursue their claims.

Just as the plaintiff in *Heyer* was certain to be denied the contract as a result of OTAC's retaliatory agenda, XPV's and Limnia's ATVM loan denials were certain because the program was nothing more than a cover for DOE to give billions of taxpayer dollars to its political cronies. *E.g.*, Compl. ¶ 41.  XPV and Limnia spent significant sums of money preparing their submissions.[8]  As in *Heyer*, neither XPV nor Limnia would have spent large amounts of time and money preparing applications had they known that DOE already decided to give loans to its favorites and to shield them from competition by denying all others. *Id.* ¶¶ 9, 68, 83–118; *see* 42 U.S.C. § 17013(d)(3); Ex. 1.  And, DOE knew—and it in fact required—that applicants would spend considerable time and expense in meeting application requirements, and so when DOE invited XPV and Limnia to submit applications, "it must necessarily be implied that it promised to give fair and impartial consideration." *See Heyer*, 140 F. Supp at 413.

*Tree Farm Development Corporation v. United States*, 585 F.2d 493 (Ct. Cl. 1978), which the Government cites to argue that DOE's political favoritism is not actionable, does not

---

[8] DOE regulations at 10 C.F.R. § 611.101 set forth fifteen different requirements for applications, including requiring each applicant to submit a comprehensive Environmental Report (ER) in its loan application as part of the National Environmental Policy Act (NEPA) review process.  DOE admitted that the preparation of an ER "may require the assistance of an environmental contractor."  Background Briefing for Webinar on NEPA & the DOE Loan Guarantee Program, lpo.energy.gov, available at http://lpo.energy.gov/wp-content/uploads/2010/09/BB-NEPA-Webinar.pdf (last visited Feb. 14, 2014).  DOE's website also states that the average timeline for an environmental assessment is six to nine months and eighteen to twenty-four months for an environmental impact statement.  FAQs, lpo.energy.gov, http://lpo.energy.gov/top-10-faqs/nepa-faq/ (last visited Feb. 14, 2014).  Aside from the lengthy NEPA review, applicants are required to fulfill technical and financial application requirements.  As part of the financial requirements, applicants must include a detailed estimate of project costs and the methodology used to produce that estimate, a detailed financial plan showing funding, equity, and debt, a business plan with income statements, balance sheets, and cash flows, a market analysis, historical financial statements audited by an independent certified public accountant, and an analysis that the applicant is financially viable based on relevant filings with the Securities and Exchange Commission.  In order to meet the technical application requirements, applicants must provide a project description and a detailed explanation of how the proposed project qualifies to receive a loan under 10 C.F.R. Part 611, including a description of the nature and scope of the project, key milestones, and project location.

support the Government's position or control this case.  In *Tree Farm*, a developer filed an

application with the New Community Development Corporation (NCDC), a corporation within

the Department of Housing and Urban Development (HUD), seeking a loan guarantee to aid in

the construction of a new community.  *Id.* at 494.  Communications between the developer and

NCDC continued until the Secretary of HUD announced that it would no longer consider any

loan proposals.  *Id.*  The Court of Claims rejected the developer's argument that the suspension

of the loan guarantee program was a breach of NCDC's implied-in-fact contract to consider its

application on the merits, in part, because there was no evidence of "arbitrary and capricious . . .

governmental conduct which the *Heyer* doctrine was designed to prevent."  *Id.* at 499.

This case is clearly distinguishable from *Tree Farm*.  There, the court refused to extend

*Heyer* to loan guarantees because the developer failed to allege favoritism.  *Tree Farm*, 585 F.2d

at 499.  By contrast, this case is all about favoritism, cronyism, and the abuse of authority.  DOE

did not evenhandedly shut down its programs and deny all applications, as did the agency in *Tree

Farm*.[9]  Rather, DOE chose favorites over eligible applicants, namely XPV and Limnia, giving

away billions of dollars of taxpayer funds without engaging "the engineering expertise needed

for technical oversight" or having performance measures in place to ensure taxpayers were

protected.  *See* Compl. ¶ 86.

Furthermore, since *Tree Farm* was decided, *Heyer* has been extended to non-competitive

bids.  In *Refine Construction Co. v. United States*, 12 Cl. Ct. 56 (1987), the Small Business

Administration (SBA) selected the plaintiff to be part of a program where SBA would enter into

---

[9] DOE's admission in January of 2013 that it was no longer considering ATVM applications does not help DOE.  The agency had already injured XPV and Limnia by treating them differently than its political favorites.  *See, e.g.*, Compl. ¶¶ 41, 72–82.  Indeed, by refusing to consider additional applications, DOE furthered its corrupt purpose by shielding its most favored applicants from competition *while simultaneously helping them fill out their applications*.

a contract with the VA and subcontract the work to the plaintiff.  *Id.* at 58.  SBA authorized the plaintiff to submit a bid and negotiate directly with the VA.  *Id.*  The plaintiff was the only company that negotiated with the VA, and during that process, the VA discovered that the plaintiff had a conflict of interest and denied the plaintiff the contracted work.  *Id.*  The plaintiff sought bid preparation costs under the theory that the Government violated its duty to fairly and honestly consider its bid.  *Id.* at 64.

In *Refine,* the Claims Court held that the government impliedly obligated itself to treat the plaintiff's proposal fairly by accepting the proposal "in the absence of any serious intrinsic or extrinsic factors that would require denial of the contract."  *Id.*  Even though the context was non-competitive, insofar as the plaintiff had been pre-selected by SBA and was the only company negotiating with the VA, the Court held that there was an implied contractual duty to fairly consider.  *Id.*  Like *Heyer*, the Court found it important that the government treat the plaintiff fairly, and the fact that the proposal was part of a noncompetitive procurement had no bearing on this obligation.  *See Keco Indus., Inc. v. United States*, 428 F.2d 1233, 1237 (Ct. Cl. 1970) ("[A] party, who can make a prima facie showing of arbitrary and capricious action on the part of the Government in the handling of a bid situation, does have standing to sue.").[10]

Moreover, the *Heyer* doctrine applies in non-procurement situations as well.[11]  In *Resource Conservation Group v. United States*, 597 F.3d 1238 (Fed. Cir. 2010), the Federal

---

[10] The *Heyer* line of cases also stands for the proposition that the Court may consider arbitrary and capricious actions taken by the Government, *Keco Indus, Inc*., 428 F.2d at 1237, as the equivalent of a failure to provide fair consideration.  *See* Mot. Dismiss 21–22.  Indeed, here DOE awarded a conditional commitment to an applicant prior to reviewing that applicant's tax delinquency status, a necessity for evaluating creditworthiness and required under DOE's own Credit Review Board Charter.  Ex. 7 (Credit Review Board Charter (June 18, 2010)).  Clearly, DOE's failure here to even-handedly evaluate applicant creditworthiness (especially in the face of its obligation) was arbitrary and capricious.  Compl. ¶ 112; *id.* Ex. 16 (DOE email).

[11] *Heyer* was decided before the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.

Circuit held that the Tucker Act provided jurisdiction over an implied contract to fairly consider

in a non-procurement situation involving allegations that the Navy breached its implied duties

when it rejected a proposal to lease government property.[12]  *Id.* at 1245; *see also Acrow Corp. of*

*Am. v. United States*, 97 Fed. Cl. 161, 171 n.6 (2011) (interpreting *Resource Conservation* to

mean that 28 U.S.C. § 1491(a) "continues to provide a basis for nonprocurement cases");

*Creation Upgrades, Inc. v. United States*, No. 09-788C, 2010 U.S. Claims LEXIS 73, at *7–12

(Fed. Cl. Mar. 24, 2010) (citing *Resource Conservation* and holding an implied contract to fairly

consider arose in the non-procurement context of federal land disposition); *Ozdemir*, 89 Fed. Cl.

at 638 ("Court of Federal Claims and its predecessors have historically exercised jurisdiction

over both procurement and non-procurement protests").  Even were this not so, the Court need

not rely on *Resource Conservation Group* to hold that the implied contract arose here, because

the ATVM and LG programs were operated like procurements.[13]

---

L. No. 104-320, 110 Stat. 3870 (1996), gave this Court bid-protest jurisdiction. ADRA's passage did not impair or change this Court's jurisdiction over implied-in-fact contracts and thus *Heyer* is still controlling precedent.  *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 94 Fed. Cl. 394, 397 (2010) ("[Section] 1491(a)(1) continues to allow any plaintiff, including a disappointed bidder, to invoke this Court's general contract jurisdiction to recover money damages, including bid preparation and proposal costs. The revision of § 1491(b) did not terminate the implied contract of fair dealing."). In fact, this Court has held that the ADRA provides jurisdiction over both procurement and non-procurement contracts.  *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 795 (2009); *Ozdemir v. United States*, 89 Fed. Cl. 631, 637 (2009) ("[I]t is clear that the language added in § 1491(b)(1) requiring a procurement nexus only qualifies the final basis for jurisdiction, i.e., violations of a statute o[r] regulation.").

[12] The *Tree Farm* court's other rationale for holding *Heyer* to be inapplicable was that the plaintiff was not a "disappointed bidder," but rather sought a government loan guarantee.  585 F.2d at 499.  In *Capitol Boulevard Partners v. United States*, 31 Fed. Cl. 758 (1994), the Court interpreted *Tree Farm* to only apply to procurement situations, stating that "even if the court were to find that [the Government] acted arbitrarily, that alone is not sufficient to apply the *Heyer* rule absent a procurement situation."  *Id.* at 762.  *Capitol Boulevard*, however, has limited applicability because, as we established above, the implied-in-fact contract to fairly consider has since been applied in non-procurement situations.  *See Res. Conserv.*, 597 F.3d at 1246.

[13] Indeed, given the procurement-like nature of the ATVM program, § 1491(b)(1) may serve as an alternative basis for jurisdiction over Plaintiffs' implied-in-fact contract claims.  *C.f. Castle-*

The Court of Appeals for the Federal Circuit has firmly held that the phrase "in connection with a procurement or proposed procurement" used in the Tucker Act is "very sweeping in scope." *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008); *Res. Conserv.*, 597 F.3d at 1244.  Specifically, the Federal Circuit explained that the term "'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need . . .  and ending with contract completion and closeout." *Id*.  The broad definition of "procurement," as adopted by the Federal Circuit, includes an agency's use of a particular contracting vehicle as part of the "determining a need" for services.[14] *See 360Training.com, Inc. v. United States*, 104 Fed. Cl. 575, 586 (2012).  Accordingly, where an agency initiates the "process for determining [its] need" for services, or selects a particular contracting instrument, whether it be a loan or loan guarantee, such activity is within the meaning of "procurement."[15] *Distributed Solutions*, 539 F.3d at 1346.  As a result, an agency engages in the "pre-procurement process" for purposes of the Tucker Act, even if the agency ultimately decides to *not* specifically propose the use of a specific "procurement" or contract vehicle.[16] *Id*.

---

*Rose Inc. v. United States*, 99 Fed. Cl. 517, 531 (2011) ("The court interprets this language to state that a protester can bring a claim for violation of the implied covenant of good faith and fair dealing; the jurisdiction for bringing the claim arises under Section 1491(b), not Section 1491(a))."

[14] Furthermore, the term "procurement" includes situations in which the agency uses a solicitation to obtain services that the agency has a statutory mandate to provide.  *See 360Training*, 104 Fed. Cl. at 586.

[15] For purposes of deciding the Government's 12(b)(1) motion to dismiss, it is appropriate for this Court to draw the reasonable inference that DOE was acquiring the services of XPV and Limnia for its own benefit.  DOE's description of its loan programs is not dispositive and, in situations such as this, the Court should look at: (1) the actual process that was used; and (2) the Government needs that DOE was trying to satisfy.  *See 360Training.com*, 104 Fed. Cl. at 584.

[16] Common sense also points to the conclusion that DOE has engaged in procurement activity.  Specifically, DOE: (1) identified the need to secure services that it could not do for itself; (2) found suitable services and goods, *e.g.,* government fleet vehicles, available in the marketplace;

The Government's reliance on *New America Shipbuilders v. United States*, 871 F.2d 1077 (Fed. Cir. 1989), for the notion that an implied contractual duty to fairly and honestly consider the DOE loan applications could not arise because the programs were not competitive and did not involve a procurement contract, is unavailing.  In *New America*, the Federal Circuit considered a contract claim involving a plaintiff's participation in an SBA program which, similar to *Refine Construction*, provided for SBA entering into a contract with a government agency and then subcontracting the work to a program participant.  *Id.* at 1078–79.  SBA and plaintiff (unsuccessfully) negotiated with the U.S. Coast Guard for a contract to build boats, and when the deal fell apart, the plaintiff claimed that an implied-in-fact contract for the construction of the boats nevertheless arose in the negotiation process.  *Id.* at 1079–80.

Neither party addressed the implied contract to fairly consider in their appellate briefs, but when asked about it during oral argument, the government asserted that it was a "judge-made rule" which "does not extend to a noncompetitive claim for a discretionary grant under any case law now available."[17]  *Id.* at 1080.  The court of appeals ultimately declined to apply *Heyer*, because neither party urged the creation of what would be a new rule.  *Id.* ("We are not willing to base a decision on a rule not urged by any party and not at all free of doubt.").

---

(3) put rules and regulations in place to select potential awardees; (4) crafted solicitation language and issued it to the commercial public; (5) offered applicants the chance to file applications; (6) convened technical review panels to supposedly review those applications neutrally after they had been submitted; (7) supposedly graded applications for technical merit; (8) demanded and extracted certain assurances and contract language in return for the potential of award of loan dollars; (9) conducted selection negotiations and debriefings with applicants during its decision-making process and while the technical panels evaluated proposals; (10) sought the experience and expertise of other agencies to evaluate the application proposals; and (11) made award decisions, which disappointed applicants challenged on the agency level.  *C.f. Pasteur v. United States*, 814 F.2d 624, 628 (Fed Cir. 1987) (explaining the elements of procurement)

[17] Defendant's Motion to Dismiss quotes this language as the holding of the case.  It is not.

Thus, *New America* did not foreclose the possibility of extending the implied contract to fairly consider to federal grant programs, and certainly did not hold that *Heyer* cannot apply to grant programs.  In fact, by noting that while "the equities [of a discretionary grant] would not be the same [as a competitive bid procurement] . . . any judge-made rule extends as far as the judges say it extends," the *New America* Court implied that such an extension is possible in a situation where the equities resembled that of a competitive procurement scenario.  *Id.*  By "equities," presumably, the appellate court meant that grant programs primarily benefit grant recipients, while a procurement results in benefits for both the Government and the contractor.

The ATVM loan program more closely resembles a procurement in this regard, because the Government received a return on its money in the form of interest, and the agency ostensibly gets to keep the benefits of its bargain, new advanced technology to secure the DOE's mission of energy independence.  *See* 42 U.S.C. § 17013(d)(4)(A); 10 C.F.R. § 611.107(b) (loans "must bear a rate of interest that is equal to the rate determined by the Secretary of the Treasury"). [18]

---

[18] Further, the ATVM program contains objective criteria DOE officials must follow when determining eligibility during the technical merit reviews.  Congress did not vest unlimited discretion in DOE to grant or deny loans to ATVM applicants.  42 U.S.C. § 17013(d)(3) states that the Secretary "*shall* select eligible projects to receive loans." (emphasis added).  10 C.F.R. § 611.103(a) provides that DOE may only reject applications that fail to meet "these [eligibility] requirements.  Section 611.103(b) also states that applications "*shall* be subject to a substantive review" based on enumerated factors, which include technical merit, economic development, diversity in technology, risk, geographic location, adequacy of security, priority of lien, and whether a manufacturer has an existing facility (emphasis added).  The enumeration of these factors cabins DOE's authority.  Thus, unlike the SBA program, DOE's decision to award loans is not purely discretionary, and it would make sense that DOE impliedly agreed to fairly review applications in connection with those criteria.

In any event, DOE's discretion (if any) does not preclude the court from reviewing DOE's conduct.  *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 909 (Fed. Cir. 1988) ("[A]lthough the Forest Service has been given discretionary authority to prescribe rules and regulations for the sale of timber from our national forests . . . and has, under the rules that it promulgated, the power to reject bids, . . . the Forest Service nonetheless also has an obligation to treat fairly responsive bids it receives.") (noting that the statutory language tempered the

*Heyer*'s implied contractual duty to fairly consider, therefore, applies to Plaintiffs' ATVM

applications, and the Court has jurisdiction over Plaintiffs' claims that the Government's

cronyism breached this duty.

### B.    DOE Breached an Implied-in-Fact Contract to Fairly Consider Plaintiffs' ATVM Loan Applications.

Even if *Heyer* did not give rise to an implied contract to fairly consider, the

Government's motion should be denied because XPV and Limnia have sufficiently pled that

DOE breached a garden-variety implied-in-fact contract to fairly and objectively review the

ATVM applications.  Compl. ¶¶ 136–46.

The elements of an express and implied-in-fact contract are identical: Offer, acceptance,

and consideration.  *La Van v. United States*, 382 F.3d 1340, 1346 (Fed. Cir. 2004); *see Maher v.

United States*, 314 F.3d 600, 606 (Fed. Cir. 2002).  A claimant must also allege that the

government's agent had actual authority to bind the government.  *Schism v. United States*, 316

F.3d 1259, 1278 (Fed. Cir. 2002) (en banc).  Satisfying these elements establishes mutuality of

intent to contract.  *Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009); *Estate

of Bogley v. United States*, 514 F.2d 1027, 1032–33 (Ct. Cl. 1975).  Despite sharing the same

elements as an express contract, an implied-in-fact contract is "founded upon a meeting of

minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct

of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'"

*La Van*, 382 F.3d at 1346 (quoting *Maher*, 314 F.3d at 606).  Indeed, the "meeting of the minds"

---

Forest Services' discretion by requiring bidding methods to "insure open and fair competition,"
and that the Forest Service did not have the discretion to reject *all* bids); *Scanwell Laboratories,
Inc. v. Shaffer*, 424 F.2d 859, 875 (D.C. Cir. 1970) ("[W]here . . . a prima facie showing of
illegality is made, the question is uniquely appropriate for judicial determination; a plea that such
actions are reserved to agency discretion will not be allowed to deny review.").  Here the
statutory language tempered the agency's discretion by requiring bidding methods that "insure[d]
open and fair competition," and DOE did not have the discretion to reject *all* bids and shutdown
the loan programs, like the agency involved in *Tree Farm* did.

requirement is an objective standard.  *See District of Columbia v. United States*, 67 Fed. Cl. 292, 339 (2005).

Consideration[19] is fact-specific, *Hunt Trust Estate v. United States*, 470 F.3d 1044, 1051 (Fed. Cir. 2006), and in determining whether a contract with the Government exists, courts must look for consideration that "flowed to the government."  *Carter v. United States*, 102 Fed. Cl. 61, 66 (2011).  Courts are limited to determining the existence of consideration, not the adequacy.  *Axion Corp. v. United States*, 68 Fed. Cl. 468, 476 (2005).  Accordingly, it is irrelevant whether the contract is a "good deal" for the parties.  *Bailey v. United States*, 54 Fed. Cl. 459, 499 (2002).  Unless there is evidence of fraud or misrepresentation, the adequacy of consideration is irrelevant.  *Id.*

Here, Plaintiffs and DOE mutually understood that they were entering into an exchange whereby the Government was obligated to fairly review Plaintiffs' ATVM loan applications. The offer is found in DOE's solicitation[20] seeking ATVM Loan Program applications, wherein it

---

[19] "To constitute consideration, a performance or a return promise must be bargained for."  *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (citation omitted).  A performance or promise is bargained for "if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise."  Restatement (Second) of Contracts § 71(2) (1981).

[20] The Government relies on *Tree Farm* to argue that DOE's solicitation constituted "a mere invitation" to submit "offers" for loan guarantees and its invitation was not itself an offer.  Mot. Dismiss 22–23.  However, as we established above, *Tree Farm* is completely off-point, and is even further distinguishable in this context.  In *Tree Farm*, the government sent a letter to the developer stating, "[b]ased on our review of your pre-application proposal, other materials submitted in support of your proposal . . . we are now *prepared to consider an application* for guarantee assistance under the Act."  *Tree Farm*, 585 F.2d at 497 (emphasis added).  The court construed this language as creating no binding obligation on the government to render a decision on the merits of the developer's application.  *Id.* at 501.  The letter also instructed the developer to include numerous conditions on the cover page of its application which bolstered NCDC's discretion to consider.  The court explained: "By the sheer number of conditions set forth, it is evident that merely because NCDC was willing to consider plaintiff's application did not mean that NCDC was offering to contractually bind itself to make a disposition of the application on the merits rather than in some other manner."  *Id.*

invited the public to submit applications for loan funds if they were deemed qualified and certain

eligibility and application requirements were met.[21]  Compl. ¶ 12.  Acceptance is found in the

applications XPV and Limnia submitted in response to the solicitation and their conformance

with all application requirements.  DOE accepted XPV's application as complete and deemed it

"eligible" for a loan.

Title 10, section 611.103 of the Code of Federal Regulations, which requires DOE to

review all applications to determine eligibility and then review eligible applications based on

objective, published criteria, provides context for the parties' expectations.[22]  Indeed, DOE

encouraged the companies to keep playing along with the application process even though it

*knew* that it would award loan funds to other parties based on a process that was "pure crap."  Ex.

---

Here, unlike the agency in *Tree Farm*, *DOE was required* to review each application and determine applicant eligibility, and if eligible, to then complete a substantive review.  10 C.F.R. § 611.103(a) ("[a]pplications *will be* reviewed to determine whether the applicant is eligible") (emphasis added); § 611.103(b) ("[a]pplications that are determined to be eligible pursuant to paragraph (a) of this section *shall be* subject to a substantive review") (emphasis added).  In *Tree Farm*, the Court of Claims found nothing to obligate the agency to review the developer's application.  The relevant regulations merely required the agency to state its "willingness to consider an application."  *Tree Farm*, 585 F.2d at 496.  Thus, the agency's expression of its "willingness" to review the developer's application was not enough to create an implied-in-fact contract.  Here, by contrast, DOE regulations obligated the agency to review ATVM Loan Program applications and to issue a merit-based decision.

[21] This prompts the question, if the invitation was *not* an offer, then what was it?  To be clear, the solicitation was an offer for the contract to fairly consider (which Plaintiffs' accepted with their applications); at the same time it was also an invitation for offers for a contract for a loan award.

[22] The Government also makes the remarkable argument that *none of DOE's promises are binding on it*, pointing to a boilerplate regulation that states: "DOE is not bound by oral representations made during the Application stage, or during any negotiation process."  *See* 10 C.F.R. § 611.105(b).  However, neither XPV nor Limnia relied upon any one particular "oral representation" by any DOE officials regarding fair consideration of their ATVM applications.  Rather, above and apart from the parties' course of dealings, they relied on the congressional mandate to run the ATVM program fairly and competitively, the statutorily-established criteria for program eligibility, and the gruesome regulatory requirements for applications and the agency's technical merit review panels.  Taken together, these all evidenced and established the parties expectations that DOE was obliged to fairly consider the applications.

3 (email from McCrea to Silver).  The only reasonable inference under these circumstances is that DOE offered to fairly review applications, and Plaintiffs accepted with their submissions.[23]

The Government argues that any alleged contract fails for want of consideration.  Mot. Dismiss 22.  This is simply untrue.  Consideration is found in Plaintiffs' applications, which enabled DOE to exercise its statutory duty to free the United States from dependence on foreign oil and to support American manufacturing.  EISA § 136.  Indeed, DOE expressly obtained services from the applicants as well—contracting parties to supply it with new energy ideas and to do its thinking to solve the country's energy and economic problems.  It also intended to buy fleet vehicles and required that applicants be willing to supply them.  Conversely, XPV and Limnia gave up plenty in exchange for DOE's promise to fairly review their applications; both applicants spent considerable time and resources preparing their applications in conformance with DOE requirements, including an excruciating NEPA review.

Finally, DOE *was specifically authorized* to enter into implied-in-fact contracts with qualified ATVM applicants.  EISA not only authorized but *required* DOE to lend.  42 U.S.C. § 17013(d)(1).  Further, Congress set forth specifically tailored objective criteria upon which DOE is required to evaluate applicants.  *Id.* § 17013(d)(3)(A)–(C).  Thus, Congress's direction to DOE to implement a competitive program and to award funds to all eligible applicants governed

---

[23] The Government relies upon *Baker v. United States*, 50 Fed. Cl. 483, 489 (2001) and *Last Chance v. United States*, 12 Cl. Ct. 551, 555–56 (1987) to support its assertion that we are merely relying upon a statute or regulation to invoke this Court's contract jurisdiction.  Mot. Dismiss 17, 23.  To the contrary, we argue that DOE's words and actions, along with the parties' interactions, all considered within the context of the statutory and regulatory framework demonstrate offer, acceptance, consideration, and a meeting of the minds, thereby creating an implied-in-fact contract.  Indeed, if the Government's argument were true, no implied contract could ever arise from the government's words and conduct in any statutorily created program.  This simply is not tenable.  *Last Chance*, is further distinguishable, because there, the plaintiff argued that it was *per se* entitled to the loan funds, where here, Plaintiffs instead argue that their applications were entitled to a fair review, which DOE denied because of its political motivations.  *See Last Chance*, 12 Cl. Ct. at 556.

the funding it supplied to the agency.  In this context, the Government's verbal and written representations to Plaintiffs are actionable.  *See Sommers Oil Co. v. United States*, 241 F.3d 1375, 1380 (Fed. Cir. 2001).  It is "sufficient for the complaint to allege that the government's promise was authorized by a person having legal authority to do so."  *Id.*  Here, XPV and Limnia have exceeded the minimal standards needed to allege an implied-in-fact contract, and the motion to dismiss counts three and four lack merit.

### C.      DOE Owed and Breached a Duty of Good Faith and Fair Dealing.

The Government argues it owed no duty of good faith and fair dealing because there is no contract to which the duty can attach.  Therefore, the fourth claim for relief should be dismissed.  Mot. Dismiss 25.  However, DOE's duty of good faith and fair dealing attached to its implied contract to fairly consider.  As this Court has observed, the Government's duty of good faith and fair dealing is often involved when there is a "bait-and-switch" scenario: "First, the Government enters into a contract that awards a significant benefit in exchange for consideration.  Then, the Government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract."  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010).[24]

The Federal Circuit has explained that the Government breaches its duty of good faith and fair dealing when it specifically targets a contract benefit, thereby destroying the plaintiff's "reasonable expectations" in "the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1290, 1304 (Fed. Cir. 2005) (the government passed legislation that targeted the favorable tax treatment that plaintiffs had received as consideration for their agreement with the

---

[24] The implied duty of good faith and fair dealing is also referred to as an implied-in-fact contract to fairly consider.  *See, e.g.*, *J.C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503, 515–16 (2012); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1134–35 (Fed. Cir. 1998).

government).  Here, the Government's abuse and cronyism destroyed Plaintiffs' reasonable

expectation that their loan applications would be considered and money lent provided that they

met the published criteria.  Like the Plaintiffs in *Centex*, XPV and Limnia lost the considerable

time and resources they put forth as consideration for the Government's duty of good faith and

fair dealing.  Compl. ¶ 115.  Therefore, the Government breached its duty of good faith and fair

dealing, and the Court has jurisdiction over the fourth claim for relief.

## II.    THE GOVERNMENT SHOULD BE EQUITABLY ESTOPPED AND SO THE FIRST CLAIM FOR RELIEF STANDS.

The first claim for relief asks this Court to estop the Government from violating the law

by denying Plaintiffs the ATVM loans that they were qualified to receive.  *See id.* ¶¶ 119–28;

Exs. 3 & 4.  To obscure DOE's wrongdoing and misdirect the analysis the Government offers a

sterile and formulaic justification that the first and second claims for relief are in the nature of

"promissory estoppel" and therefore non-justiciable.  Mot. Dismiss 13–14, 19.  It argues that

Plaintiffs "attempt to create a cause of action" by asking this Court to "order DOE to grant

XPV's and Limnia's ATVM Loan Program applications" concluding, without analysis, that

"[s]uch a claim is not permissible in this court."  *Id.* at 14.  But this is not a case where estoppel

is being used offensively to force the Government to pay money contrary to law or to recover

under a quasi-contract implied-in-law.  Rather, the estoppel here is to *defend* Plaintiffs' rights

and to vindicate and preserve the contract implied-in-fact created by the parties.

### A.  There Was a Contract, Implied-in-Fact, to Lend.

A contract implied-in-fact is based on inferences drawn from an objective analysis of the

parties' conduct.  *See Hercules*, 516 U.S. at 424; *Biltmore Forest Broad. FM, Inc. v. United

States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009); *Peninsular & Oriental Steam Navigation Co. v.

Overseas Oil Carriers, Inc.*, 553 F.2d 830, 834 (2d Cir. 1977), *cert denied*, 434 U.S. 859 (1977);

*J.C. Pittman & Sons, Inc. v. United States*, 317 F.2d 366, 368 (Ct. Cl. 1963).[25]  The statutory and

regulatory commands to DOE, including the command that it lend ATVM monies to qualified

applicants under statutory and *published* regulatory criteria, drive the objective analysis of the

parties' conduct, from solicitation to application to evaluation to negotiation to decision.

*Hercules*, 516 U.S. at 424.

Viewed objectively, in the context of the controlling statutes and regulations and DOE's

programmatic purpose, the parties' course of dealings over a year-long period reflected at least a

tacit understanding that ATVM loans would be made and that Plaintiffs' applications met

applicable statutory and regulatory criteria.  *See* Compl. ¶¶ 21–74.  The course of dealing created

the parties' contract implied-in-fact to lend.

### B.    The Government Is Estopped From Denying This Contract.

Equitable estoppel may be used "to prevent [the Government] from denying the existence

of a contractual agreement."  *Emeco Indus*, 202 Ct. Cl. at 1014.  To assert equitable estoppel,

these four elements must exist: (1) the party to be estopped must know the facts; (2) he must

intend that his conduct shall be acted on or he must so act that the party asserting the estoppel

has a right to believe it is so intended; (3) the innocent party must be ignorant of the true facts;

and (4) he must rely on the other's conduct to his injury.  *Id.* at 1015.  Also, this Court has held

that a party asserting equitable estoppel against the Government must demonstrate "affirmative

---

[25] Contract formation does not require a subjective meeting of the minds, for where the actions and conduct of the parties provide objective manifestation of assent, the issue of whether there has been an actual meeting of the minds is irrelevant.  The focus is not on what the parties intended their conduct to convey, but is instead on whether the parties' conduct, when viewed objectively, manifested and confirmed a tacit understanding that the Government would pay or perform.  *Hercules*, 516 U.S. at 424; *Porter v. United States*, 496 F.2d 583, 590, *cert. denied*, 420 U.S. 1004 (1975); *Chavez v. United States*, 18 Cl. Ct. 540, 544–45 (1989).  The elements of an implied-in-fact contract include offer, acceptance, consideration, and actual authority on the part of the Government's representative to bind the Government.  *Schism*, 316 F.3d at 1278 (en banc).

misconduct in the form of a violation of the law." *Linda Newman Constr. Co. v. United States*, 48 Fed. Cl. 231, 239 (2000); *Zacharin*, 213 F.3d at 1371.

In *Emeco*, the Government was equitably estopped from denying the existence of a contract with a manufacturer of index card boxes.  202 Ct. Cl. at 1019.  After a favorable plant inspection by the Government, Emeco placed an order for the materials it needed to fully perform but then the government decided to split the award between Emeco and a late bidder. Emeco had already manufactured units in excess of the actual award, prompting it to sue under an equitable estoppel theory.  *Id.* at 1008–10.  The *Emeco* court ruled that the government was aware of the facts surrounding the solicitation because only it knew of the offer to the second company.  *Id.* at 1015–17.  The court also determined that the government failed to inform Emeco of the other company's bid and failed to cancel the inspection due to the late bid.  *Id.* at 1016.  As a result, Emeco reasonably relied upon the government's conduct to its detriment because it ordered materials necessary for completion of the entire order, and the government was estopped from denying payment.  *Id.* at 1017–19.

Here, as in *Emeco*, DOE knew all the facts but failed nonetheless to inform Plaintiffs that the ATVM program was in truth a piggy-bank for political insiders or to alert Plaintiffs to any legitimate deficiencies in their applications in a timely fashion.  DOE intentionally solicited ATVM applications, then strung XPV along and led it to believe that loans would be forthcoming because DOE's lending criteria had been satisfied, fully intending that Plaintiffs would act on DOE's solicitations and representations and knowing how much time and money this exercise would cost them.  Plaintiffs, in fact, relied on these solicitations and representations, ignorant of the fact that DOE had decided to hold ATVM funds for cronies and blind to the reality that the process was a sham.  Instead they assumed (and reasonably so) that DOE would

lend them money because they met the statutory and regulatory criteria and because DOE, in fact, told them so.  Therefore, they spent countless hours and substantial sums on loan applications, losing private investment, and profits.  Compl. ¶¶ 13, 118.

Plaintiffs have pled ample evidence of Government misconduct.  DOE was statutorily obligated to lend to all eligible applicants not merely favored cronies.  42 U.S.C. § 17013(d).  XPV and Limnia had protectable legal rights and expectations because the Government told them that they had met the statutory and regulatory funding criteria and because, objectively, they had.  Compl. ¶¶ 21–29, 36–68, 74, 83–17.  Instead, DOE skewed the program to ensure that only the politically connected benefited, and it did so using opaque "merit review" criteria, which remains secret to this day and which DOE used to arbitrarily reject Plaintiffs' applications.  *Id.* ¶ 83.  DOE's conduct, and its disregard for the rule of law, is precisely the kind of affirmative misconduct that supports estoppel claims.  *See Tree Farm*, 585 F.2d at 496.[26]

In its opening brief, the Government argues that this Court should decide the central issues in this case at the motion to dismiss stage, without fully considering the legal and factual issues that are better suited for decision after production of an administrative record.  In doing so, the Government mischaracterizes XPV and Limnia as arguing that the loan guarantee statute,

---

[26] Although mere invitations by the government to file applications do not necessarily equate to an operative offer, the *Tree Farm* court pointed out:

> There is no allegation that other loan guarantee applications [in *Tree Farm*] were given favorable treatment at the expense of Tree Farm's application.  The facts alleged, viewed most favorably for plaintiff, establish just the opposite—that Tree Farm's application received an evenhanded treatment by the [agency] officials up until the Title VII loan guarantee program was suspended and afterward.

*Tree Farm*, 585 F.2d at 496 (holding that defendant's letter stating that it would consider an application for guarantee assistance and subsequent application by plaintiff did not create an implied contract as there was no mutual intent to create a contract and defendant's letter was a mere invitation to submit an application).  In this case, *the allegations are precisely that other applications were given favorable treatment* at Plaintiffs' expense and that XPV and Limnia did not receive evenhanded treatment from the government.  Compl. ¶¶ 24–25, 83–113.

itself, "creates a contractual obligation to grant the applied-for loans."  Mot. Dismiss 16.  That

line of argument confuses DOE's duty to fairly consider, which XPV and Limnia were owed but

did not receive, and DOE's statutory duty to lend.  Contrary to the Government's

characterization, Plaintiffs are not asking this Court to "create a cause of action," *id.* at 14, nor

force the Government to lend contrary to controlling laws and regulations.  Instead, Plaintiffs *are*

asking this Court to estop the Government from conduct that is *contrary* to the controlling laws

and regulations.  Thus, the motion to dismiss Plaintiffs' first claim for relief should be denied.

## III.   THE GOVERNMENT IS ESTOPPED FROM REFUSING TO ACCEPT LIMNIA'S LG APPLICATION AND SO THE SECOND CLAIM FOR RELIEF STANDS.

The second claim for relief is to estop the Government from refusing to accept Limnia's

LG program application despite its authorized agents having promised that it would do so.

Compl. ¶¶ 129–34.  The Government wrongly argues that its words are never actionable and the

Court lacks jurisdiction over all promissory estoppel claims.  *See* Mot. Dismiss 19–21.

Neither the Supreme Court nor the Federal Circuit has ever ruled that all promissory

estoppel claims, in all circumstances, are non-justiciable.[27]  Nor, to our knowledge, has the Court

of Claims or the Federal Circuit ever definitively held that promissory estoppel claims must

*always* fall outside the scope of the Tucker Act.  In fact, controlling case law reveals that a

contractual relationship arises between the government and a private party if promissory words

of the former induce significant action by the latter in reliance thereon.[28]  *See George H. Whike*

---

[27] Defendant relies on *Twp. of Saddlebrook*, 104 Fed. Cl. at 111, to claim the Court lacks jurisdiction over claims for promissory estoppel. That case, in turn, relies on *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir. 1981). However, the Court in *Saddlebrook* mistakenly identifies *Jablon* as a Federal Circuit case.

[28] When there is no fundamental lack of authority by statute or regulation, an estoppel may be constructed on traditional common law grounds.  *Emeco*, 485 F.2d at 652; *Manloading & Mgmt. Assocs., Inc. v. United States*, 461 F.2d 1299, 1302–03 (Ct. Cl. 1972) (oral representations by an authorized official that caused detrimental reliance and did not nullify a statutory requirement

*Constr. Co. v. United States*, 140 F. Supp. 560 (Ct. Cl. 1956) (holding that the promissory estoppel rule found in Restatement (Second) of Contracts § 90 was "applicable").

This is particularly so in cases of affirmative misconduct by the Government "in the form of a violation of the law," as is alleged here. *Linda Newman Constr.*, 48 Fed. Cl. at 239; *Zacharin*, 213 F.3d at 1371; Compl. ¶¶ 21, 23, 29, 37, 83–118; *see also Int'l Air Response v. United States*, 75 Fed. Cl. 604, 612 (2007) (finding implied-in-law claim within this Court's jurisdiction when brought by the government as a counterclaim). The Government cites to *Empresas Electronics Walser, Inc. v United States*, 650 F.2d 286 (Ct. Cl. 1980) for the proposition that DOE cannot be bound by oral assurances, "if other required procedures have not been taken." Mot. Dismiss 20. Here, however, there was no failure to take "required procedure," as the Government claims, because the regulation at issue here, 10 C.F.R. § 609.10(b) was not in effect when Mr. Chu made his oral representations. *Compare* Compl. ¶ 77 (Limnia application filed Feb. 10, 2009) *with* 74 Fed. Reg. 63,549 (10 C.F.R. § 609.10(b) proposed as rule Aug. 7, 2009, promulgated Dec. 4, 2009). Instead, DOE promulgated this regulation on December 4, 2009, nearly eight months *after* it denied Limnia's application on April 9, 2009. *See* Compl. ¶ 81. Thus Mr. Chu was not acting beyond the regulatory directive, because it was not yet in effect and *Empresas* does not control.

---

were held to bind the government and result in a contract amendment that renewed the contract for the next fiscal year); *see also Hercules, Inc. v. United States*, 516 U.S. 417, 423–24 (1996) (Tucker Act jurisdiction includes contracts inferred from "tacit understandings" and conduct) (citations omitted); *Nat'l Rural Utils. Coop. Fin. Corp. v. United States*, 14 Cl. Ct. 130, 137 (1988), *aff'd*, 867 F.2d 1393 (Fed. Cir. 1989) (citations omitted). The Court of Claims acknowledges the importance of upholding oral representations, for "[m]eetings between Government procurement officers and prospective bidders would become a sham" if bidders were not permitted to rely on the government's statements. *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1008 (Ct. Cl. 1972) 106, 131 (1972). "Questions would be useless, for answers would be without force, and the amounts of the bids received would soon show the results. Respect for the answer is required by the respect given the Government's procurement process." *Id.*

The authorities generally hold that this Court has jurisdiction over contracts implied-in-fact but not implied-in-law.[29]  A contract is implied-in-law when one party confers a benefit on another party and equity requires compensation, so by a legal fiction a promise is imputed to perform a legal duty.  The Government typically argues that promissory estoppel creates a contract implied-in-law with a private party that otherwise would not exist and therefore all promissory claims are futile.[30]  To the contrary, promissory estoppel arguments are akin to implied-in-fact contract claims, over which this Court possesses jurisdiction, *see OAO Corp. v. United States*, 17 Cl. Ct. 91, 101 (1989), and thus promissory estoppel claims are distinguishable from implied-in-law contract arguments, over which this Court lacks jurisdiction.  *See Hercules*, 516 U.S. at 424 (the Court of Federal Claims "jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law").[31]  Contrary to the Government's suggestion, therefore, promissory estoppel *does not necessarily* create a contract-implied-in-law, but can give rise to an implied-in-fact contract claim because the standard used to evaluate an implied-in-fact claim closely parallels that of traditional promissory estoppel proofs.  *Compare OAO Corp*, 17 Cl. Ct. at 106 (implied-in-fact standard is "whether the Government's conduct was arbitrary and capricious" when evaluating the elements of offer,

---

[29] Generally they hold this way, but not always. *See United States v. Amdahl Corp.*, 786 F.2d 387 (Fed. Cir. 1986); *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147 (Fed. Cir. 1983); *Yosemite Park & Curry Co. v. United States*, 582 F.2d 552 (Ct. Cl. 1978); *Prestex v. United States*, 320 F.2d 367 (Ct. Cl. 1963); *N.Y. Mail & Newspaper Transp. Co. v. United States*, 154 F. Supp. 271 (Ct. Cl.), *cert denied*, 355 U.S. 904 (1957).

[30] Thus, the Court's jurisdiction excludes promissory estoppel cases because the Government reasons, incorrectly, that all promissory estoppel claims are synonymous with contracts implied in law, whereas equitable estoppel claims are synonymous with contracts implied-in-fact. *See Litchtefeld-Massaro, Inc. v. United States*, 17 Cl. Ct. 67, 71 (1989); *Saddlebrook*, 104 Fed. Cl. at 111; *Zacharin*, 213 F.3d at 1371.

[31] *See generally* William Boyd & Robert Huffman, *The Treatment of Implied-in-Law & Implied-in-Fact Contracts & Promissory Estoppel in the United States Claims Court*, 40 Cath U. L. Rev. 605 (1991).

acceptance, consideration, and meeting of the minds) *with Law Mathematics & Tech, Inc. v. United States*, 779 F.2d 675, 678 (Fed. Cir. 1985) (applying an "arbitrary and capricious" standard to determine whether a third party reasonably relied upon a government representation such that his position changed for the worse).

In its brief, the Government erroneously relies on *Township of Saddlebrook v. United States*, 104 Fed. Cl. 101, (2012). *Saddlebrook* is inapplicable here. In *Saddlebrook*, the government promised to engage in flood control and the parties asserted a bare claim that they had entered into an "agreement," with the Government, but they failed to provide *any* indication of conduct demonstrating mutual intent by both parties to enter into a contract, *e.g.*, the occurrence of negotiations, consultation, or an explicit offer to perform flood remediation. *Id.* at 104–05. The facts in *Saddlebrook* are clearly distinguishable. Here, Limnia responded to a Government solicitation by submitting an application; without such applications DOE would be unable to exercise its statutory duty of implementing a new energy policy that would "ensure jobs for our future with secure, affordable, and reliable energy." *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat 594 (2005). Limnia gave up plenty in exchange for DOE's promise to waive its application fee; Limnia spent considerable time and resources preparing its applications in conformance with DOE requirements, including an excruciating NEPA review. *See* Compl. ¶ 77; 10 C.F.R. § 609.6(19). Presumably Mr. Chu understood how burdensome the application requirements were when he promised to waive the application fee. Viewed objectively, this all gives rise to the inference that DOE and Limnia had a "meeting of the minds" regarding submission of Limnia'a application in return for waiver of the application fee.[32]

---

[32] *See* Compl. ¶ 12 (XPV responded to a Government solicitation and offered collateral to secure

In this circumstance, *Whike* is the better precedent, and that case demonstrates that the

Court has jurisdiction.[33] *George H. Whike Constr. Co. v. United States*, 140 F. Supp. 560 (Ct.

Cl. 1956).  In *Whike*, a contractor placed an express condition upon its bid that it would be

---

the requested loan); *id.* ¶¶ 13–22 (XPV could perform and meet loan conditions); *id.* ¶ 26 (Government representative promises eligibility and technical merit review, underwriting and loan closing); *id.* ¶ 28 (XPV assured that it "appeared to be fully compliant and passed technical review"); *id.* ¶ 36 (XPV assured it met criteria and that a loan would be announced "any day"); *id.* ¶ 38 (XPV met written criteria but denied a loan due to undisclosed and unpublished "merit review" criteria, contrary to law); *id.* ¶¶ 40–53 (verbal reasons for denial were pretexts); *id.* ¶¶ 55–61 (written explanation raised entirely new "reasons" and pretexts for denial); *id.* ¶ 64 (Government did not say XPV failed to meet statutory or regulatory criteria for receiving a loan); *id.* ¶¶ 68–81, 113–17.

[33] *Manloading* also demonstrates that the Court has jurisdiction over Limnia's estoppel claim. *Manloading & Mgmt Assocs., Inc. v. United States*, 198 Ct. Cl. 628 (1972).  *See* Compl. ¶¶ 75– 82.  In *Manloading*, the Government solicited bids for a one-year contract on a two-year project. *Manloading*, 198 Ct. Cl. at 631.  The government's agent orally represented to Manloading and other prospective bidders that it would renew the contract to the winning bidder for the project's second year.  *Id.* at 1301.  Manloading participated on the strength of the government's oral assurance, won the contract, and began work, expending considerable funds throughout the process.  *Id.*  A disappointed bidder challenged the government's award to Manloading.  *Id.*  The government re-procured and Manloading lost the contract it was orally promised to receive during the second year of the project.  *Id.*  Manloading sued.

The Court found that not only was the Government's agent "fully authorized" to inform the bidders of its plan for renewing funding during the contract's second year, *id.* at 1302, but that the government's agent intended for Manloading to rely on his oral representations.  *Id.* at 1303.  Thus the Court held:

> At the time the statement was made, the Government was acting in a proprietary capacity, and there is no indication that [the contract officer's] representations had the effect of nullifying a statutory requirement. Under all the circumstances, we think this is an appropriate case for applying the doctrine of equitable estoppel which, in effect, results in an amendment that renewed [plaintiff's] contract…for the next fiscal year.

*Manloading*, 461 F.2d at 1303 (citations omitted).  Likewise, Mr. Chu as the Department Secretary and a member of the President's Cabinet had full authority to inform Limnia of his plan to waive the "unduly onerous and burdensome" application fee.  Compl. ¶ 76.  Mr. Chu should have fully anticipated that Limnia would reasonably rely on this representation, and in fact Limnia did, when it submitted its application nearly a week later on February 10, 2009.  *Id.* ¶ 77.  Just as the court adopted the doctrine of equitable estoppel in *Manloading*, it should also adopt that doctrine here to estop DOE from rejecting Limnia's LGP application on the ground that it failed to pay the waived application fee.

entitled to additional compensation for overtime.  *Id.* at 561–62.  The final contract did not

contain the overtime condition; even though the condition was not in writing, the government

officials had given oral assurance that the condition would be controlling in the final contract.

*Id.* at 562.  The prevailing law changed during the course of the contractor's performance and

would have prevented the contractor from receiving the compensation that the agency had orally

promised to pay him.  *Id.* at 562–63.  Citing the new law, the agency denied the contractor's

claim for additional compensation.  *Id.*  The court held that the contractor began performing its

contract in reliance upon government's promise to pay overtime compensation and that the

government was bound by those promises based on the doctrine of promissory estoppel, despite

the change in law.  *Id.* at 127–31.

Here, Limnia discussed the LG application fee with Secretary Chu and other Government

officials prior to submitting its application.  Compl. ¶¶ 75–82.  Secretary Chu promised that the

Government would waive the fee and induced Limnia to file an application, just as the

Government officials in *Whike* promised that the conditions in the contractor's bid would control

over the contract's language.  Chu was the ultimate decisionmaker for the loan programs, so

Limnia reasonably relied on his promise that the application fee would be waived, and indeed

such reliance was detrimental because Limnia's application was rejected, and it cannot now

submit another application because the program is closed to further submissions.  Just as the

Court of Claims held the Government liable and bound by its promises in *Whike*, the Court here

should hold that DOE was bound to its promises and estop it from denying Limnia's application.

DOE should be held accountable.

## CONCLUSION

For the foregoing reasons, the Government's motion to dismiss their second amended complaint under RCFC 12(b)(1) and 12(b)(6) should be denied in its entirety.


Dated:  February 18, 2013

<div style="margin-left:40%">

Respectfully submitted,

/s/ Daniel Z. Epstein
DANIEL Z. EPSTEIN
CAUSE OF ACTION
1919 Pennsylvania Ave, N.W., Suite 650
Washington, D.C. 20006
Telephone: (202) 499-4232
Facsimile: (202) 330-5842
daniel.epstein@causeofaction.org

REED D. RUBINSTEIN
KAREN M. GROEN

*Attorneys for the Plaintiffs*

</div>